May it please the Court, the proposition is that the government, I mean the trial court was in error when it found that Cooker abandoned the HUD contract because the contracting officer admitted in trial testimony that he prevented Cooker's performance when he required him to turn it in. Mr. Hogan, Cooker at one point says I've had enough of this expletive deleted, I assure you. Yes. Isn't that a pretty good indication that he was not going to pursue anything further that he had abandoned? Well, Mr. Hooker is not a sophisticated contractor, he's a gentleman who's been in the woods all his life and he was told to go on. So we can really rely on his words being full of integrity and he, when he says he's had enough, he's had enough, right? He said that in a deposition a couple of years ago and I don't remember the context exactly but the issue remains that we had a modification that extended that contract until October the 1st, 1999 or until a new contract. He turned in his equipment, did he expect to continue the contract that he turned in his equipment? He was required to turn it in. Did he object? Did he object in any way when the government said, you know, we'd like you to turn in the equipment and to submit a final invoice? Did he say, well, wait a sec, I've got a contract and I'm not done? I think he relied on the fact that they had a right to tell him to go home and stop working. In other words, he acquiesced and didn't object. Correct? It's correct that he did not object but I don't agree. That leaves him with a little dilemma, does it not? Because the question then is, if he didn't object, isn't it correct to say he abandoned him, walked away from him? I would assume that Mr. Hooker didn't know he could object. He had had these contracts for a number of years and he had done whatever they told him to do. And if they told him to turn in his stuff and go home... Well, but interestingly, he didn't reform after November 30th of 1999. He didn't turn his equipment in until January. So how is it that the government prohibited him from performing between November 30th when he submitted what he termed a final invoice to the government? How did they prohibit him from performing between November 30th and January when he turned his equipment in? Well, I believe, if you look back in the trial testimony, the way Mr. Hooker was directed to trap both the Beaver and Hunt Hoggs was he was told, go into Section 8 and look for Hoggs. So I would assume that nobody would give him any direction between those two times. But he turned in what he wrote on a final invoice in November of 1999. Why isn't all of that... I mean, your standard of review here is pretty tough. This is not a question of law. And there are an awful lot of facts out there. So why isn't that evidence that would at least make it such that you can't say it was a clearly erroneous determination by the local court? Well, I think looking at the four corners of the modification tells you that the only way that that modification would end would be a date certain, October 31, or until a new contract was awarded. What damages amount are you seeking? The minimum, it was an indefinite quantities contract. And the minimum on that was $11,000 a year, I believe. I think it might have been $10,000. It was $200, $150 a month. Is that right? It was $10,000. $10,000. So the new contract was not awarded until sometime in the fall of 2001, which would be approximately two years of minimum quantity. $10,000 contract. How much have you conceivably consumed in litigating this matter? Lots. Is it more than $10,000? Yes. Can you explain that to me? Well, we have several other issues that we appealed. It was not only the high count. How much are those? How much is really the whole question for the other issues, isn't it? Because under the Lieber contract, what the lower court found is you haven't articulated any quantitative measure of damages for which you would be entitled to relief. And that was the failure of proof that was offered at the lower court. So how much of Judge Rader really is right to the heart of the issue? There was no proof whatsoever as to an amount that Mr. Hooker ought to receive and what that amount would be for with regard to the Lieber contract. Was there? Well, there was testimony on the reformation issue. Mr. Hooker did testify he would have bid significantly higher on the Lieber had he known he would be working with the family nation. So is that really the pot of gold that's being sought here? Is that, well, if I had known that I was going to have to go and trap these beavers in this contaminated area, I would have bid five times higher. So let's reform the contract and I'll walk away with five times the amount. He testified that doing hot work for the government, you would automatically increase it five times. He had another job as an estimator for Westinghouse. And he did testify as to that. The other... But that's entirely speculative, is that not? He says I would have bid that. There's nothing to indicate that the government would have signed on to that. There's nothing to indicate any actual damages in terms of, well, once I found out I had to go out and buy a protective gear or I had to do this side or the other. There's nothing. Or that you had any medical expenses because of any potential radiation exposure that you could have suffered or anything along those lines. There's no evidence, I believe, at this point, that there are any actual damage to anyone. No, ma'am, and I think that would be untoward. So how much did he want? He wanted the balance of the Lieber contract because that was stopped in the middle of the summer when he started asking for more money. And that can be ascertained. And he wanted a reformation of the whole Lieber contract. But the Lieber contract was a requirement contract. Yes, it was. And the government had an explanation as to why its requirements no longer warranted his services. We had an explanation. It came up in depositions way after the fact. But the conditions aren't after the fact. The drought happened at the time. The Lieber weren't there anymore. Well, we disagree. So one with Mr. Hooker's expertise would have recognized that, wouldn't he? Yes, and he testified, as did his employee, that the drought did not impact the streams at all since the water came from somewhere else. And so the business reason that a drought stopped the Lieber activity is false. We had testimony from the hydrologist on the site. Yes, we did. I understand. To kind of summarize, unless you can tell me something different from what I've heard so far, you're here seeking at most $10,000. Well, no, because the... And you admittedly consumed far more than that in the beginning. I'm just trying to figure out the logic of why we're here. Actually, it would be $20,000 or $22,000, if it's $10,000 or $11,000, for the indefinite quantity minimum. Yeah, I can tell you, we kept pursuing this because it seemed important. Do you want to preserve your rebuttal time? Yes, I would, sir. Thank you, Mr. Melnyk. Mr. Melnyk. Mark Melnyk for the government. The record, the trial record, amply contains evidence upon which the trial court could rely in order to conclude that Mr. Hickory did abandon the country. Both the contracting officer and the contracting officer's representative testified that at the time that they closed out the contract, first of all, at the time that Mr. Hooker was told that the contract would be closed down and he was informed that his final invoice was being characterized as such, the contracting officer was asked at trial whether Mr. Hooker protested in any way, whether he indicated something to the effect of, I continue to have rights under this contract to perform, or anything along those lines, that he intended to perform or anything like that, whether he intended to come back to perform, and the answer was no, he did not protest. On the second occasion when he turned in his equipment, the contracting officer's representative was asked the same question at trial, did he protest, did he indicate any indication that he believed he continued to have any contract rights, and the answer was no, he did not. Based upon this evidence, the trial court's conclusion that he abandoned the contract is not clearly erroneous and should be sustained by the court. The same, essentially the same concept applies also with respect to his claim for reformation. With respect to that, Mr. Hooker did not put on any evidence of any damages. He didn't put on any evidence that he was indeed exposed to any hazardous substances while engaging in the activities that he was engaging in, trapping beaver and hunting hawks. He put on no evidence to that effect. The government, on the other hand, a report was put into evidence that had been done. How would he have detected the hazard? Well, if in fact there was a hazard, your honor, that would have caused him to incur some sort of expenses, that would be the basis of a claim. He put on no evidence to that effect. He did not take the position that he or his employees have been harmed in any way, they've suffered any illnesses as a result of this. He would have had the opportunity at trial to put on experts to testify to the effect that in fact they performed some sort of scientific study that determined that from this kind of activity there would be hazards presented, and he didn't. On the other hand, there was a National Institutes of Health study presenting the evidence that concluded that in fact there was no harmful effects from these activities, that the level of radiation that he and his employees were exposed to was essentially one quarter of a chest x-ray, and it concluded that there was no danger from these activities, hunting hawks and trapping beaver. So in the face of that evidence, in the face of his failure to put on any contrary evidence, perhaps more significantly in the face of his failure to put on any evidence of damages at all, the trial court's conclusion that he had failed to prove that claim is also sustained, should also be sustained as non-clearly arraignments. And finally, his claim that there was bad faith in the refusal to provide additional work to him during the summer period of 1999. Once again, the trial court had the testimony of the government officials who were asked that question. What was the purpose of the drop-off in giving the work? And they said it was as a result of the drought reducing their need for trapping beaver. The contract was not about eliminating all the beaver on the site. It was about eliminating the nuisance beavers. Their conclusion from the presence of the drought was that there was a reduction in the number of nuisance beavers that they needed to be taken out. They testified to that effect. Mr. Hooker put on no evidence of bad faith on their part. All he put on was his testimony and that of his employee to the effect that, in their opinion, there was a need to remove beavers. But the fact that they may have such an opinion is not evidence of bad faith on the part of the government officials who have contrary opinion. So for that reason, the trial court's conclusion that he had failed to demonstrate bad faith should be sustained as not being clearly arraignments. For foregoing reasons, we respectfully request that the trial court's judgment be affirmed. Thank you, Mr. Connell. Ms. Nichols, you have four or five minutes remaining. Thank you, Your Honor. I should have mentioned this before and got confused, but when you inquired as to why Hooker did not contest turning in his equipment, at the same time, there was another solicitation outstanding by the contracting officer for the same contract, which had, by its terms, it would have expired in September of 1999 had they not drafted a modification that extended it until a new contract was awarded. And they had another solicitation out. Mr. Hooker had bid on that, as had several others. Now, the testimony of the trial was very unclear as to how or whether it was ever withdrawn. The contracting officer testified that it must have been because, you know, he couldn't find anything in writing, but it must have been because it was decided to do it the hog-trapping in-house. But there was also testimony that the contracting officer kept asking Hooker for extensions into April of 2000. So Hooker would not object to the previous contract being shut down because he knew there was another solicitation outstanding, and he kept extending the time on that. So there would be no reason for him to say, oh, wait, let me continue on this one. So that is the answer to that question. As far as Hooker, Hooker was still, if you'll remember, in July when the Beaver contract was essentially shut down, Hooker was still hunting hogs. So he was out on that site consistently and had the opportunity to see what the Beavers were doing. And, you know, the court obviously had the right to judge the testimony of the contracting officer's representative against Hooker and his employee. But Hooker was on the site during that time period and had a chance to observe what was going on. So it was a difference in the payment history. But it still is clear that the streams were not fed by rainfall alone. And the outflow from the nuclear plants, they used the water to pull the stuff right out to the river. And the water came from there, it came from the groundwater, it came from the surface water. That's all I have. Thank you. Thank you, Ms. Nichols.